Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISS LAW**
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN BUSHANSKY,<br><br>Plaintiff,<br><br>vs.<br><br>POSHMARK, INC., MANISH CHANDRA, NAVIN CHADDHA, JENNY MING, EBONY BECKWITH, JEFF EPSTEIN, HANS TUNG, and SERENA J. WILLIAMS,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Stephen Bushansky ("Plaintiff"), on behalf of himself and all others similarly situated, upon information and belief, including an examination and inquiry conducted by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Complaint:

## NATURE OF THE ACTION

This is an action brought by Plaintiff against Poshmark, Inc. ("Poshmark" or the "Company") and the members of Poshmark's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Poshmark will be acquired by NAVER Corporation ("NAVER") through NAVER's subsidiaries Proton Parent, Inc. ("Proton Parent") and Proton Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.   On October 3, 2022, Poshmark and NAVER issued a joint press release announcing entry into an Agreement and Plan of Merger dated October 3, 2022 (the "Merger Agreement") to sell Poshmark to NAVER.  Under the terms of the Merger Agreement, each Poshmark stockholder will receive $17.90 in cash for each share of Poshmark common stock (the "Merger Consideration").  The Proposed Transaction is valued at approximately $1.2 billion.

3.   On November 15, 2022, Poshmark filed a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that Poshmark stockholders vote in favor of the Proposed Transaction, omits, or misrepresents material information concerning, among other things: (i) Company management's financial projections; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor Goldman Sachs & Co. LLC ("Goldman"); and (iii) the background of the Proposed Transaction   Defendants authorized the issuance of the false and misleading Proxy Statement in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.   In short, unless remedied, Poshmark's public stockholders will be irreparably harmed because the Proxy Statement's material misrepresentations and omissions prevent them from making

a sufficiently informed voting or appraisal decision on the Proposed Transaction. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

6. The Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company is headquartered in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8. Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Poshmark.

9. Defendant Poshmark is a Delaware corporation, with its principal executive offices located at 203 Redwood Shores Parkway, 8th Floor, Redwood City, California 94065. The Company operates as a social marketplace for new and secondhand style products in the United States, Canada, India, and Australia. Poshmark's common stock trades on the Nasdaq Global Select market under the ticker symbol "POSH."

10. Defendant Manish Chandra ("Chandra") co-founded the Company and has been President, Chief Executive Officer ("CEO"), and a director of the Company since February 2011.

11. Defendant Navin Chaddha ("Chaddha") has been a director of the Company since February 2011.

12. Defendant Jenny Ming ("Ming") has been a director of the Company since June 2019.

13. Defendant Ebony Beckwith ("Beckwith") has been a director of the Company since August 2021.

14. Defendant Jeff Epstein ("Epstein") has been a director of the Company since April 2018.

15. Defendant Hans Tung ("Tung") has been a director of the Company since March 2016.

16. Defendant Serena J. Williams ("Williams") has been a director of the Company since January 2019.

17. Defendants identified in paragraphs 10-16 are referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

18. NAVER is Korea's largest internet company and one of the country's leaders in both search and e-commerce. In Korea, NAVER is one of the leading platforms for both searching and shopping. NAVER operates Korea's No.1 search engine and largest e-commerce platform, and is a leading provider of fintech services, digital content, and cloud services to a global community. NAVER's platform is home to more than 530,000 smartstores ("sellers") and generates more than 70% of online shopping services in South Korea. NAVER cultivates a culture of 'Founder-type leaders' who continue to launch innovative mobile applications, including LINE (Japan's No.1 messaging app), Zepeto and Webtoon.

19. Proton Parent is a Delaware corporation formed by NAVER.

20. Merger Sub is a Delaware corporation and wholly owned subsidiary of Proton Parent.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

21. Poshmark is a leading social marketplace for new and secondhand style for women, men, kids, pets, home and more. Its community of more than 80 million registered users across the U.S., Canada, Australia, and India is driving the future of commerce while promoting more sustainable consumption. Powered by the Company's proprietary technology, Poshmark's social marketplace is purpose-built to enable simple transactions, seamless logistics, and an engaging experience at scale. As of December 31, 2021, the Company had 7.6 million Active Buyers.

22. Poshmark empowers people to sell a few items or to become successful entrepreneurs by providing them with end-to-end seller tools. The Company's comprehensive infrastructure makes it easy for sellers, from casual consumers to professional sellers, brands, and retailers, to build their businesses with seamless listing, merchandising, promotion, pricing, and shipping. Sellers use content, inventory selection, and social interactions to monetize their listings. Poshmark's fee is 20% of the final price for sales $15 and over, or a flat rate of $2.95 for sales under $15. Poshmark attracts, engages, and retains sellers by creating a vibrant community where sellers can use their personal passion for economic empowerment. The Company does not own or manage inventory as all products are listed, managed, sold, and shipped by sellers, utilizing Company transaction tools that makes the selling process seamless and easy. This asset-light model creates scalability and favorable working capital dynamics.

23. On August 9, 2022, Poshmark announced its third quarter 2022 financial results and business developments. For the quarter, net revenues of $88.4 million were an increase of 11% from the third quarter of 2021. Gross Merchandise Value grew 7% year-over-year from the third quarter of 2021 to $475.6 million, up from $442.5 million in the same period last year. Trailing 12 months

Active Buyers reached a record 8.2 million, a 13% year-over-year increase from 7.3 million in the third quarter of 2021. Reflecting on the Company's results, defendant Chandra stated:

> We reported another strong quarter and are pleased that our results exceeded our initial expectations, despite a tough consumer environment. Poshmark continues to be a top destination for fashion, as demonstrated by 13% trailing-twelve-months Active Buyer growth to a record 8.2 million in the third quarter. The power of Poshmark's community combined with its robust marketplace platform continues to drive user engagement which grew 61% year over year to a record 62.6 billion social interactions during the trailing-twelve-months ended September 30, 2022.
>
> In October, we announced our acquisition by Naver Corp. (KRX: 035420) and are excited to partner with them as we take Poshmark into its next phase of growth as we expand our platform, elevate our product and user experiences, and enter new and larger markets. Our industry continues to evolve at a rapid pace, and we are excited to continue to lead the future of shopping by providing our community with an unparalleled experience that is simple, social, fun and sustainable.

**The Proposed Transaction**

24.     On October 3, 2022, Poshmark and NAVER issued a joint press release announcing the Proposed Transaction. The press release states, in relevant part:

> SEONGNAM-SI, South Korea & REDWOOD CITY, Calif.--(BUSINESS WIRE)-- Naver Corp. (KRX: 035420) ("Naver"), Korea's largest internet company, and Poshmark, Inc. (NASDAQ: POSH) ("Poshmark"), a leading social e-commerce marketplace for new and secondhand style, today announced that they have entered into a definitive agreement under which Naver will acquire all of the issued and outstanding shares of Poshmark for $17.90 in cash, representing an enterprise value of approximately $1.2 billion. This represents a premium of 15% to Poshmark's closing stock price as of October 3, 2022, a 34% premium to the 30-day volume weighted average price, and a 48% premium to the 90-day volume weighted average price of Poshmark's shares.
>
> **Management Commentary**
>
> Choi Soo-Yeon, Chief Executive Officer of Naver:
>
> "The combination will create the strongest platform for powering communities and re-fashioning commerce. Poshmark is the definitive brand for fashion in the United States that provides a social network for buying and selling apparel. Naver's leading technology in search, AI recommendation and e-commerce tools will help power the next phase of Poshmark's global growth."

> "Poshmark is a natural fit for our business – our two companies share a common set of values and vision around content, community and empowerment. Bringing Naver and Poshmark together will immediately put us at the forefront of creating a new, socially responsible, and sustainable shopping experience designed around sellers of all sizes and interests – from individual and influencer sellers to professional sellers, brands and specialty boutiques – and a large, loyal, and highly engaged social community. We are excited to work closely with Manish and his talented team to create lasting value for all our stakeholders."

Manish Chandra, Founder and Chief Executive Officer of Poshmark:

> "The opportunity to join forces with Naver – one of the world's leading and most innovative and successful internet companies – is a testament to the strength of our brand, operating model, and what we've built over the last decade with our talented team and amazing community. Our industry continues to evolve at a rapid pace, and we are excited to continue to lead the future of shopping by providing our community with an unparalleled experience that is simple, social, fun and sustainable."

> "This is a highly compelling opportunity for our employees, who will benefit from being part of a larger, global organization with shared values and complementary strengths. This transaction also delivers significant and immediate value to our shareholders. Longer term, as part of Naver, we will benefit from their financial resources, significant technology capabilities, and leading presence across Asia to expand our platform, elevate our product and user experiences, and enter new and large markets. I look forward to partnering with Naver as we take our company into its next phase of growth."

**Redefining Commerce and Community Around a Shared Vision**

The inherent strengths of both companies lie in their unwavering commitment to content, community and empowerment:

- **Content**. Naver is home to the largest number of bloggers in Korea and the largest number of digital creators of stories (Wattpad) and comics (Webtoons) globally. Poshmark is a leader in creating unique styles and fashion trends, including the growing K-Fashion apparel segment.
- **Community**. Naver is the largest and longest-standing online community in Korea, where more than 36 million monthly users access its search portal and various online community services. Its metaverse platform, Zepeto, is the second largest metaverse app in the world, with a growing, vibrant community for members to create and share whatever they imagine. Naver's community also extends to other large, fast-growing, and highly engaged groups, including its K-Pop fandom community Weverse, which is jointly owned with BTS' management company, one of the most successful groups of all time. Poshmark is the destination of choice for more than 80 million registered users. Among them, active users spend approximately 25 minutes of their day buying

and selling apparel online, and gather in-person at Posh Party Live events held in various cities around the world.

- **Empowerment**. Naver is dedicated to empowering the long tail – it is the largest enabler of e-commerce for small and medium-sized businesses in Korea and has revolutionized content creation by democratizing the publication of digital comics through Naver Webtoons. At Poshmark, anyone can easily list and sell what is hanging in their closet at home, and anyone can make a social impact through the promotion of socially responsible, sustainable commerce.

The transaction will create a global player in online fashion re-commerce by combining Poshmark's unique discovery-based social shopping platform and deeply engaged community with Naver's technological prowess in upleveling the e-commerce experience. Poshmark will also leverage Naver's proven expertise and track record in Asia and its significant expertise from backing and investing in other fashion and consumer-to-consumer (C2C) e-commerce platforms globally.

The combination accelerates Naver's strategy to build a global e-commerce community portfolio to capture the growth in large markets around the world, including Poshmark's home market of North America. Together, the companies expect to increase purchase conversion rates, deepen user engagement, create an industry leader in livestreaming commerce, and enhance the unique relationship- and discovery-based experiences that are driving fast-growing re-commerce verticals.

**Strategic and Financial Benefits**

- **Expands Long-Term Opportunity in Fashion Re-commerce and Creates Globally Distributed User Base with Influx of Younger Users**: The addition of Poshmark will expand and diversify Naver's search-driven e-commerce business into the global secondhand C2C market for fashion. The combination will also allow Naver to capitalize on the increasing consumer shift in fashion to online re-commerce, which is an $80 billion market today in the U.S. alone, and is expected to grow by 20% annually to $130 billion by 2025.

  Poshmark currently has a community of over 80 million registered users, across 90% of zip codes in the U.S. In 2021, the company generated approximately $2 billion in gross merchandise value (GMV) with a take rate of 20% and gross margin of 85%. Its primary demographic of millennials and Generation Z users is the largest shopping demographic for secondhand goods and a key driver of the circular economy and community-based platforms. One of Poshmark's strong appeals to the growing number of conscious consumption shoppers is the important role it plays in extending the lifecycle of millions of previously made items and reducing fashion's footprint. These users will expand and complement Naver's current user base.

- **Creates a Global Commerce Community with Access to Poshmark's Social Networking and Discovery-Based Shopping**: Naver is a proven community builder, connecting more than 28 million monthly users across its

Naver Café platform – an open social community where users create their own groups to share content, ideas, and information broadly, across a large number of topics and categories – as well as its Metaverse and K-Pop fandom communities.  Poshmark has created unique relationship-oriented "micro" communities that are based around social engagement with friends and family and discovery-based shopping.  Poshmark's simple, easy, and community-centered fashion marketplace will give Naver access to a highly engaged and diversified community, where sellers become buyers and buyers become sellers, and add a global social networking element to Naver's portfolio of services.

- **Enhances Poshmark's User Experience with Naver's Unrivaled and Innovative Technology Offerings**: Poshmark will instantly benefit from Naver's deep technology stack and AI-based capabilities, including its smart lens image recognition and search technologies.  These capabilities are highly complementary to Poshmark's product development strategy, and together will allow Poshmark to offer a new search and shopping experience by integrating Naver's shopping search engine, which allows users to enter additional search keywords according to their preference on colors, designs, and materials.  Specifically, with access to Naver's image recognition technology, Poshmark users will be able to identify where to find and buy products by scanning objects and shopping through the camera on their phones without needing to know the exact name of the product.  This capability will make it easier to both identify new products and sell items, enhancing the user experience.

- **Leverages Naver's Proven Data Analytics Technology to Improve Marketing and Engagement Strategies to Make Poshmark the Platform of Choice for Buyers and Sellers**: As the largest advertising platform in Korea, Naver's ad-serving infrastructure will play an instrumental role as Poshmark explores rolling out ads to its deeply engaged community.  For instance, Poshmark will be able to leverage Naver's "Biz Advisor" and "Analytics" AI analytical tools, which analyze sales statistics to manage data more effectively, and in turn, increase the number of sellers on Poshmark's platform.  These enhancements will dramatically advance Poshmark's service offering, resulting in greater customer acquisition, retention, and buyer conversion, as well as enhance its community engagement and user experiences.  With Naver Pay commanding the largest share of online payment processing in Korea, the combination will also enable Poshmark to develop innovative payment solutions to expand its ecosystem of buyers and sellers.  Additionally, with Naver's technologies, Poshmark will be able to provide more suitable product recommendations for customers after analyzing products, user communities, and the closets of the users' favorite sellers in real-time.  Together, the companies can develop a service that allows users to search with shopping keywords so that the most suitable product will be recommended to the right user.

- **Enables Global Live Commerce Adoption**: Livestream shopping is a key driver of e-commerce in China and Korea (and increasingly in the U.S.) today, allowing shoppers to buy products in real-time through live video broadcasts, enabling greater insights and more clarity around purchasing decisions.  Naver's Shopping Live solution is the leader in Korea, one of the world's

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

  largest live shopping markets, and an essential feature of Naver's e-commerce platform with over $25 billion in GMV transacted in 2021. Naver expects that the enablement and enhancement of live streaming capabilities within the Poshmark platform will transform the shopping and selling experience and strengthen Poshmark's community by allowing for greater social networking and engagement.

- **Further Expands Global Footprint for Both Naver and Poshmark**: Poshmark will benefit from Naver's global presence in high-growth markets, particularly in Korea, one of the world's most innovative and highest penetrated e-commerce industries. This is where Naver is the leading search engine and largest e-commerce channel, and the only search technology company in the world that has successfully expanded into an e-commerce platform. Naver's footprint also includes Japan, where it has joint ownership in Z Holdings, one of the world's largest internet service groups, with assets such as Yahoo! Japan and Japan's leading smartphone messaging platform, LINE, which Naver created and launched in 2011 and now operates in over 230 countries and is used by more than 70% of those populations. With Naver's support, Poshmark will pursue a broader international expansion strategy in the medium-term, including into other developed markets in Asia.

  In addition, this transaction provides Naver with an enhanced foothold in the U.S., expanding its international profile, which it has steadily increased both organically and through investments over the past 20 years. Naver will build on its existing U.S. footprint, including Webtoon Entertainment, which is based in Los Angeles and extremely popular with younger audiences, and its $600 million acquisition of Wattpad in 2021. Naver has benefited from the recent global digital disruption and transformation of media and publishing through Wattpad and Webtoon Entertainment, and looks to extend their growth in the region with the addition of Poshmark.

- **Significant Synergy Potential**: The transaction is expected to generate significant revenue and cost synergies, consisting primarily of:
  - Re-acceleration of annual revenue growth beyond 20% in the near-term by leveraging Naver's advertising capabilities to drive further monetization, accelerating investment to drive growth overseas, and expanding live commerce adoption.
  - Approximately $30 million in run-rate annual cost savings within 24 months post-closing including through rationalization of public company costs and driving of higher operating leverage across operating and other cost functions.

**Operating Structure and Leadership**

Upon completion of the transaction, Poshmark will become a standalone U.S. subsidiary of Naver and will continue to be led by CEO Manish Chandra and Poshmark's current management team.

Poshmark will continue to operate under its existing brand, as well as maintain its employee base, Poshmark community, and headquarters in Redwood City, California.

**Transaction Details**

The transaction, which was unanimously approved by both Naver's and Poshmark's Boards of Directors, is expected to close by the first quarter of 2023, subject to approval by Poshmark stockholders and the satisfaction of certain other customary closing conditions. The transaction is not contingent on any financing.

Naver has secured voting and support agreements with certain stockholders of Poshmark, representing approximately 77% of the outstanding voting power of Poshmark common shares.

The transaction is expected to be funded with Naver's cash balances and other existing financing sources.

\*\*\*

**Advisors**

LionTree LLC is serving as Naver's exclusive financial advisor and Kirkland & Ellis LLP is serving as Naver's legal counsel. Goldman Sachs & Co. LLC is serving as exclusive financial advisor to Poshmark, and Goodwin Procter LLP is serving as Poshmark's legal counsel.

**Insiders' Interests in the Proposed Transaction**

25.     Poshmark insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Poshmark.

26.     Notably, certain Company insiders have secured positions for themselves with the combined company. For example, defendant Chandra has entered into a binding employment term sheet with Merger Sub (the "Employment Term Sheet") pursuant to which he will serve as CEO of the surviving corporation and will be appointed to the board of directors of Proton Parent, effective as of the date on which the closing occurs (the "closing date"). Pursuant to the Employment Term Sheet:

- defendant Chandra will be entitled to an annual base salary of $425,000;

- defendant Chandra will be eligible for a target annual bonus equal to 100% of his base salary;

- all Unvested Company RSUs held by defendant Chandra, valued at approximately $10,000,000, will fully vest as of the closing date and be converted into the right to receive on the day following the closing date a number of fully vested shares of Proton Parent common stock; and

- defendant Chandra will be granted an option to purchase a number of shares of Proton Parent common stock (the "New Hire Options"), having an aggregate grant date fair market value equal to the Company's equity value as of the closing date, divided by the Company's enterprise value as of the closing date, *multiplied* by $32,500,000.

27. Moreover, Company insiders stand to reap substantial financial benefits for securing the deal with NAVER. Pursuant to the Merger Agreement, upon closing of the merger, all outstanding Company options and restricted stock units ("RSUs") held by Company insiders will vest and convert into the right to receive cash payments. The following table summarizes the value of Company options and RSUs that Company insiders stand to receive upon closing of the merger:

| | Number of Shares Subject to Vested Company Options (#)(1) | Weighted Average Exercise Price of Vested Company Options ($) | Number of Shares Subject to Unvested Company Options (#)(2) | Weighted Average Exercise Price of Unvested Company Options ($) | Value of Shares Subject to Company Options ($) | Number of Unvested Company RSUs (#)(3) | Value of Shares Subject to Unvested Company RSUs ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| **The Company's Executive Officers** | | | | | | | | |
| Manish Chandra | 938,457 | 1.45 | 41,667 | 10.77 | 11,464,345 | 562,359 | 10,066,226 | 21,530,571 |
| Rodrigo Brumana | — | — | — | — | — | 688,415 | 12,322,629 | 12,322,629 |
| John McDonald | 470,212 | 2.54 | 6,667 | 10.77 | 7,271,160 | 167,352 | 2,995,601 | 10,266,761 |
| **The Company's Non-Employee Directors** | | | | | | | | |
| Ebony Beckwith | — | — | — | — | — | 19,625 | 351,288 | 351,288 |
| Navin Chaddha | — | — | — | — | — | 15,324 | 274,300 | 274,300 |
| Jeff Epstein | 359,512 | 4.60 | — | — | 4,781,510 | 15,324 | 274,300 | 5,055,810 |
| Jenny Ming | 41,339 | 14.80 | — | — | 128,151 | 15,324 | 274,300 | 402,451 |
| Hans Tung | — | — | — | — | — | 15,324 | 274,300 | 274,300 |
| Serena Williams | 127,500 | 10.77 | 52,500 | 10.77 | 1,283,400 | — | — | 1,283,400 |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

28.  Further, if they are terminated in connection with the Proposed Transaction, Poshmark's named executive officers stand to receive substantial cash severance payments, as set forth in the following table:

| The Company's Executive Officers | Cash ($)(1) | Continued Health Benefits ($)(2) | Total ($) |
|---|---|---|---|
| Manish Chandra | 955,377 | 41,196 | 996,573 |
| Rodrigo Brumana | 653,160 | 26,361 | 679,521 |
| John McDonald | 619,132 | 26,361 | 645,493 |

***The Proxy Statement Contains Material Misstatements or Omissions***

29.  The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Poshmark's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

30.  Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Company management's financial projections; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Goldman; and (iii) the background of the Proposed Transaction.

***Material Omissions Concerning Company Management's Financial Projections***

31.  The Proxy Statement omits material information regarding Company management's financial projections.

32.  Specifically, the Proxy Statement fails to disclose the line items underlying the Company's: (i) Gross Profit; (ii) Adjusted EBITDA; and (iii) Unlevered Free Cash Flow.

33.  The omission of this material information renders the statements in the "Certain Financial Projections" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Goldman's Financial Analyses***

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

34. The Proxy Statement omits material information regarding Goldman's financial analyses.

35. The Proxy Statement describes Goldman's fairness opinion, and the various valuation analyses they performed in support of its opinion. However, the descriptions of Goldman's fairness opinion and analyses fail to include key inputs and assumptions underlying these analyses. Without this information, as described below, Poshmark's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Goldman's fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek appraisal.

36. With respect to Goldman's *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) quantification of the inputs and assumptions underlying the discount rates of 12.5% to 15.0% used in the analysis; and (ii) quantification of the net present value of cash tax savings from federal net operating loss carryforward.

37. With respect to Goldman's *Premia Analysis*, the Proxy Statement fails to disclose the specific transactions observed and the acquisition premia for each of the transactions observed.

38. Without such undisclosed information, Poshmark stockholders cannot evaluate for themselves whether the financial analyses performed by Goldman were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required to ensure that stockholders can fully evaluate the extent to which Goldman's opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction or seek appraisal.

39. The omission of this material information renders the statements in the "Opinion of Goldman Sachs" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

*Material Omissions Concerning the Background of the Proposed Transaction*

40.     The Proxy Statement omits material information regarding the sale process leading to the Proposed Transaction.

41.     For example, the Proxy Statement sets forth that in connection with the sale process certain third parties entered into confidentiality agreements with the Company that contained standstill provisions. The Proxy Statement fails, however, to disclose whether any of the standstill restrictions are still in effect and the specific conditions under which any standstill provision would fallaway.

42.     The omission of this material information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act

43.     The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff, and the other stockholders of Poshmark will be unable to make an informed voting or appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Claims Against All Defendants for Violations of Section 14(a) of the
Exchange Act and Rule 14a-9 Promulgated Thereunder**

44.     Plaintiff repeats all previous allegations as if set forth in full.

45.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements,

considering the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

46. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants. It misrepresents and/or omits material facts, including material information about Company management's financial projections, the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by Goldman and the background of the Proposed Transaction. The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

47. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or seek to exercise their appraisal rights.

48. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

49. Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Claims Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

50. Plaintiff repeats all previous allegations as if set forth in full.

51. The Individual Defendants acted as controlling persons of Poshmark within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Poshmark, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed

with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

52. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy Statement.

54. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

55. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

56. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a

direct and proximate result of defendants' conduct, Poshmark's stockholders will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Poshmark, and against defendants, as follows:

    A.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Poshmark stockholders;

    B.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

    C.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

    D.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

    E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 22, 2022　　　　　　　　**WEISS LAW**
Joel E. Elkins

By: */s/ Joel E. Elkins*

Joel E. Elkins
611 Wilshire Blvd., Suite 808
Los Angeles, CA 90017
Telephone: 310/208-2800
Facsimile: 310/209-2348
　　　　-and-
Michael Rogovin
476 Hardendorf Ave. NE
Atlanta, GA 30307
Telephone: 404/692-7910
Facsimile: 212/682-3010

*Attorneys for Plaintiff*